Yitzhak Abba MARTA *v.* STATE of Arkansas

CR 98-105 983 S.W.2d 924

Supreme Court of Arkansas
Opinion delivered January 14, 1999

*Denny Hyslip*, Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *Mac Golden*, Asst. Att'y Gen., for appellee.

A NNABELLE CLINTON IMBER, Justice. The appellant in this case, Yitzhak Abba Marta, told the victim's mother that her "son was killed because of his sexual preferences." After a three-day trial, the jury found Mr. Marta guilty of capital murder, and the court sentenced him to life imprisonment without parole. We affirm.

On November 12, 1996, the police discovered Alan Walker's slain body in the floor of his bedroom near the entrance to his bathroom. Mr. Walker had been strangled and beaten several times in the head with a hard metal or wooden object. At the time of his death, Mr. Walker was wearing only a pair of lady's

heels and a wig. The letters "KKK" were written in blood on the wall, and there was a significant amount of blood splattered on the walls, ceiling, and bed sheets. A reddish fluid, possibly blood, was found on the bathroom sink. The tires to Mr. Walker's vehicle were slashed, and a television, VCR, boom box, watch, fireplace set, and several rings were missing from his duplex.

After an investigation, the police charged Yitzhak Abba Marta and Adam Blackford with the murder of Mr. Walker. Mr. Marta and Mr. Blackford were tried separately. After Mr. Blackford was convicted of first-degree murder, he agreed to testify against Mr. Marta with the understanding that his testimony might result in some leniency on his sentence. At the beginning of Mr. Marta's trial, the court declared Mr. Blackford an accomplice as a matter of law. Mr. Blackford then testified that in the early morning hours of November 9, 1996, he and Mr. Marta went to a local bar where they met Mr. Walker, who was dressed as a woman. Both Mr. Blackford and Mr. Marta thought that Mr. Walker was a woman. Mr. Walker invited them back to his home for a party. When they arrived at Mr. Walker's home, Mr. Walker and Mr. Marta went into the bedroom, while Mr. Blackford remained in the living room. Mr. Blackford then decided to steal Mr. Walker's television and boom box for drug money. Mr. Blackford placed both items in the back of his red Chevy pick-up, and then slit the tires to Mr. Walker's car. Soon after Mr. Blackford reentered the duplex, Mr. Marta came out of the bedroom and exclaimed, "I'm going to Jack him [Mr. Walker] up." Mr. Blackford retrieved a crowbar from his pick-up truck and handed it to Mr. Marta. Mr. Blackford also disabled both of Mr. Walker's phones. As Mr. Walker exited from his bathroom, Mr. Marta struck him approximately five to ten times with the crowbar. As Mr. Walker attempted to arise from the floor, Mr. Blackford took the crowbar from Mr. Marta and struck Mr. Walker two or three additional times. Mr. Blackford then attempted to remove any trace of their presence from the duplex. Meanwhile, Mr. Marta wrote the letters "KKK" on the wall with Mr. Walker's blood. During this time, Mr. Marta made several derogatory remarks about Mr. Walker's sexual preference. As the two men left Mr. Walker's duplex, they decided to get rid of the stolen items. The

two men smashed the television and boom box and dumped the pieces in a nearby creek. Mr. Blackford later directed the police to the creek where they retrieved portions of the broken television and boom box.

Several witnesses corroborated Mr. Blackford's story. First, several people testified that they saw Mr. Blackford and Mr. Marta talk to Mr. Walker outside the bar, and then get into a red Chevy pick-up truck and follow Mr. Walker's car as it left the bar. One witness, who was suspicious of the two men, correctly recorded the license plate to Mr. Blackford's Chevy truck. Mr. Walker's supervisors testified that he did not appear for work on the morning of November 9. Friends and relatives testified that several items were missing from Mr. Walker's duplex, including a television, boom box, and some rings.

Mr. Marta's wife, Rochelle Marta, testified that her husband and Mr. Blackford came home around 4:00 a.m. on November 9. While Mr. Marta was taking a shower, Mrs. Marta searched his belongings and found two rings that she had never seen before. Mrs. Marta could not go back to sleep and remained awake in her bedroom until she left for work around 8:00 a.m. During this time, Mrs. Marta overheard her husband and Mr. Blackford talking and "laughing hysterically." She did not hear either man leave the trailer. Sometime later, Mrs. Marta could not find the clothes, towel or washrag that Mr. Marta used that morning. Mrs. Marta testified that this was unusual because Mr. Marta never cleaned-up after himself. The next day, when Mrs. Marta asked her husband about the rings, he gave her several different explanations including that he found them, that they belonged to his mother, that he got them at a flea market, and that Mr. Blackford gave them to him. Later that day, Mr. Marta showed the rings to his wife again. This time the rings looked like they had been burned.

Next, two men testified about statements Mr. Marta made while he was incarcerated with them. First, Harold Galbraith testified that Mr. Marta made several derogatory remarks about homosexuals, including that they deserved to die, and that whoever killed Mr. Walker was a hero. Mr. Galbraith also overheard Mr. Marta tell Mr. Blackford, "You should have covered your

tracks. That's what you get for not covering your tracks." According to Mr. Galbraith, Mr. Marta insinuated that Mr. Blackford should have covered his tracks as he [Mr. Marta] had done. During the investigation, Mr. Galbraith told Officer Anthony Smith that the letters "KKK" were written in blood on the victim's wall, which was a fact that had not been released to the press.

A second inmate, Dana Coleman, testified that Mr. Marta said that he and Mr. Blackford went home with a man they thought was a woman. When Mr. Marta discovered that Mr. Walker was a man, Mr. Marta became very angry and hit Mr. Walker. Mr. Blackford got a baseball bat from his truck, and Mr. Marta, followed by Mr. Blackford, "slugged" Mr. Walker with the bat.

Finally, Mr. Marta testified in his own defense. Mr. Marta admitted that he and Mr. Blackford went home with Mr. Walker. Mr. Marta asserted that when he discovered that Mr. Walker was a man, he "told the victim that it wasn't my cup of tea. I don't do these sort of things. I thanked her, him for inviting me over, but I don't do these sort of things. I didn't hurt his feelings in any kind of way." Mr. Marta claimed that he and Mr. Blackford were shown to the door by Mr. Walker. Mr. Marta declared that he laughed about the matter when they returned home, but Mr. Blackford was not amused. Mr. Marta also claimed that sometime after 5:00 a.m., Mr. Blackford sneaked out of the trailer, and returned to Mr. Walker's duplex where he killed Mr. Walker and stole some of his property.

At the conclusion of the trial, the jury found Mr. Marta guilty of capital murder. Because the State waived the death penalty, the court sentenced Mr. Marta to life imprisonment without parole. Mr. Marta timely filed a notice of appeal.

## I. Sufficiency of the Evidence

For his first argument on appeal, Mr. Mart claims that the trial court erred when it denied his motion for a directed verdict. Motions for a directed verdict are treated as challenges to the sufficiency of the evidence. *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998). When reviewing the sufficiency of the evi-

dence on appeal, we do not weigh the evidence but simply determine whether the evidence in support of the verdict is substantial. *Passley v. State*, 323 Ark. 301, 915 S.W.2d 248 (1996). In this respect, substantial evidence is direct or circumstantial evidence that is forceful enough to compel a conclusion and which goes beyond mere speculation or conjecture. *Id.* In making this determination, we review the evidence in the light most favorable to the State. *Id.*

■ On appeal, Mr. Marta claims that the State failed to adequately corroborate the testimony of Mr. Blackford, who the trial court declared was an accomplice as a matter of law. Arkansas Code Annotated § 16-89-111(e)(1) (1987) provides that:

> A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.

The corroboration must be sufficient standing alone to establish the commission of the offense and to connect the defendant with it. *Peeler v. State*, 326 Ark. 423, 932 S.W.2d 312 (1996); *Gordon v. State*, 326 Ark. 90, 931 S.W.2d 91 (1996). The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Peeler, supra; Gordon, supra.* Circumstantial evidence qualifies as corroborating evidence but it too must be substantial. *Peeler, supra; Gordon, supra.* Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Peeler, supra; Gordon, supra.*

■ After eliminating Mr. Blackford's testimony, we conclude that the State sufficiently connected Mr. Marta to the capital murder of Mr. Walker. Mr. Marta admitted during the trial that in the early morning hours of November 9 he and Mr. Blackford were with Mr. Walker in the duplex where Mr. Walker's body was later found. Moreover, Mr. Walker's supervisors testified that Mr. Walker failed to appear at work as scheduled on November 9. In *Passley, supra,* we said that "the presence of the accused in the

proximity of a crime, opportunity, and association with a person involved in the crime in a manner suggestive of joint participation are relevant facts in determining the connection of an accomplice to a crime."

Next, Mr. Coleman testified that he heard Mr. Marta say that he "slugged" the victim with a bat. Likewise, Mr. Galbraith testified that he heard Mr. Marta tell Mr. Blackford that homosexuals deserved to die, and Mr. Marta insinuated that Mr. Blackford should have covered his tracks as he [Mr. Marta] had done. In response, Mr. Marta claims that the inmates' testimony is inherently unreliable because it was possibly given in exchange for leniency from the State. It, however, is well settled that the credibility of witnesses is an issue for the jury, and not this court. *See Sanford v. State,* 331 Ark. 334, 962 S.W.2d 335 (1998); *Bell v. State,* 334 Ark. 285, 973 S.W.2d 806 (1998). Moreover, Mr. Marta sufficiently brought the issue of credibility to the jury's attention during cross-examination of both inmates.

There was also some physical evidence that corroborated Mr. Blackford's story. First, Mr. Walker was found laying near the entrance to the bathroom in his bedroom, and he was wearing nothing but a wig and women's shoes. The police also found pieces of a television and a boom box in a creek near the victim's home.

Finally, Mrs. Marta said that her husband returned to their trailer on the morning of November 9 with some rings she had never seen before. The next time she saw the rings, they appeared to have been burned, which could indicate that Mr. Marta tried to destroy them. In *Passley, supra,* we said that possession of stolen property by the accused is a proper circumstance to consider in determining whether there was evidence tending to connect him with the crimes. In response, Mr. Marta asserts that the State never proved that the rings were the same rings missing from the victim's duplex. Again, this would be a factual issue to be resolved by the jury.

Based on this evidence, we conclude that there was evidence independent of the accomplice's testimony that sufficiently connected Mr. Marta with the capital murder of Mr. Walker.

Accordingly, we affirm the trial court's denial of Mr. Marta's motion for a directed verdict.

## II. *Motion for a Mistrial*

Mr. Marta took the stand in his own defense. During direct examination, Mr. Marta admitted that he had pled guilty to burglary and spent one year in the penitentiary for that crime. During cross-examination, Mr. Marta, a Mexican citizen, conceded that he falsely used his brother's name and social security number in order to obtain a job in the United States. Mr. Marta also admitted that the day before Mr. Walker's body was found he quit his job in the United States so that he could return to Mexico. The following colloquy then transpired:

STATE: That felony conviction. You said you did one year in the pen, right?

MARTA: Yes, sir.

STATE: You got a five year sentence, though, didn't you?

MARTA: That's correct.

STATE: And it wasn't just a burglary, it was a burglary by —

MARTA'S ATTORNEY: Your Honor, I'm going to object if it's something else. It's just —

STATE: Burglary by definition has an underlying felony. You can't commit burglary without the underlying felony. Now, the State is allowed to inquire into not only on cross-examination, what the —

COURT: I think its an issue of credibility. Overruled. You may proceed.

STATE: It was actually a residential burglary in that you entered someone else's home and *stole personal property from the victims by force*, isn't that correct?

MARTA: No, that's not correct, sir.

STATE: That's not correct? Can you explain for me, then, why the documents, your commitment documents describe the crime in that manner?

MARTA: Well, the victims accused me of going in with a fire-arm and holding them at gunpoint. I never did hold them at gunpoint. I was guilty of burglary.

STATE: In fact, you were originally *charged* with theft of property —

MARTA'S ATTORNEY: Objection.

STATE: — aggravated robbery and aggravated assault.

MARTA: No. I was not.

COURT: Just a minute, just a minute. One at a time. Let the witness finish his response, then you ask the question. If there's an objection, you make and objection and I'll address the objection. Now, let's start again. You have an objection?

MARTA'S ATTORNEY: I do, Your Honor. May I approach?

COURT: You may.

MARTA'S ATTORNEY: Your Honor, my objection is that [the State] can't get into what Mr. Marta was originally charged with. I think he can ask him what he pled to, what he was found guilty of which was residential burglary.

COURT: I think he can actually ask him the facts of the particular burglary because he's testified it was a burglary and apparently there was something else, but as far as the charges are concerned, I don't think that's proper impeachment.

(Emphasis added.)

The court sustained Mr. Marta's objection to the question regarding the charges of aggravated assault and aggravated robbery. Mr. Marta then moved for a mistrial and stated that he did not think that an admonition could cure the error. The court denied the motion, and admonished the jury as follows:

> Ladies and gentlemen, members of the jury, you should disregard the former question asked by the prosecutor . . . relating to alleged charges in prior cases involving Mr. Marta. You should

totally disregard the question and whatever response was made by this witness and in no way consider it evidence in this case.

The questioning continued as follows:

STATE: Mr. Marta, let me clarify. Your testimony, then, is that you were not, you did not plead guilty or were convicted of burglary with the underlying felony of stealing personal property from victims by force? That's what your testimony is?

MARTA: I was — I plead guilty to burglary.

STATE: I understand that, Mr. Marta. What I'm asking you is are you saying that then, that part of the burglary, which an underlying felony, that's the definition of burglary, *are you disputing that the underlying felony was that you stole personal property from the victims by force?*

MARTA: Yes — no, no, I'm not disputing that.

STATE: You're not disputing that.

MARTA: No.

(Emphasis added.)

On appeal, Mr. Marta contends that the trial court erred when it failed to grant his motion for a mistrial due to the prosecutor's question about his prior *charges*, but not convictions, for aggravated assault and aggravated robbery. We do not need to consider whether the State's question was improper because the court sustained Mr. Marta's objection. Hence, the sole issue is whether the trial court committed a reversible error when it refused to grant a mistrial, and whether the admonition cured any prejudice.

■ It is well settled that a mistrial is an extreme remedy that should be granted only when the error is beyond repair and cannot be corrected by curative relief. *Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998); *Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998). The trial court has wide discretion in granting or denying a motion for a mistrial, and we will not disturb the court's decision absent an abuse of discretion or manifest prejudice

to the movant. *Kemp v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998); *Strawhacker v. State*, 304 Ark. 726, 804 S.W.2d 720 (1991).

■ Mr. Marta did not object to the State mentioning that the underlying crimes for the burglary conviction were aggravated assault and aggravated robbery. In fact, Mr. Marta did not object when the State asked him if "he stole personal property from the victims by force." Instead, Mr. Marta only objected when the State specifically mentioned that he had been *charged* with, but not *convicted* of, aggravated assault and aggravated robbery. In other words, Mr. Marta did not object to the jury knowing about his prior conduct. Instead, he did not want the State to mention that the conduct was the basis for a separate charge of which he was never convicted. Because the jury knew, without objection, that Mr. Marta had immigration problems, that he was a felon, and that he had previously used force to take a person's personal property [which was similar to the facts of this case], we cannot say that the State's mention of the charges resulted in such "manifest prejudice" that it was not cured by the judge's admonition. Accordingly, we also affirm on this point.

### III. Medical Examiner's Testimony

The autopsy of Mr. Walker's body was performed by Dr. Kokes from the State Crime Laboratory. Dr. Sturner, the chief medical examiner for the State Crime Laboratory, reviewed Dr. Kokes's report and signed off on the analysis. Dr. Kokes was not able to appear at the trial, so Dr. Sturner testified in his place. After recognizing Dr. Sturner as an expert in the field of forensic pathology, the court allowed Dr. Sturner to testify as to the results of the autopsy performed by Dr. Kokes.

On appeal, Mr. Marta argues that Dr. Kokes's failure to appear at trial deprived him of his statutory right to confront the person who actually performed the autopsy about his methodology and findings. Arkansas Code Annotated § 12-12-313 (Repl. 1995) provides that:

> (a) The records and reports of autopsies, evidence analysis, drug analysis, and any investigations made by the State Crime Laboratory under the authority of this subchapter shall be received as

competent evidence as to the matters contained therein in the courts of this state subject to the applicable rules of criminal procedure when duly attested to by the executive director or his assistants, associates, or deputies.

(b) Nothing in this section shall be deemed to abrogate a defendant's right of cross-examination if notice of intention to cross-examination [sic] is given prior to the date of hearing or trial pursuant to the applicable rules of criminal procedure.

(c) The testimony of the appropriate analyst may be compelled by the issuance of a proper subpoena, in which case the records and reports shall be admissible through the analyst who shall be subject to cross-examination by the defendant or his counsel.

(d)(1) All records and reports of evidence analysis of the State Crime Laboratory shall be received as competent evidence as to the facts in any court or other proceeding when duly attested to by the employee who performed the analysis.

(2) The defendant shall give at least ten (10) days notice prior to the proceedings that he requests the presence of the employee of the State Crime Laboratory who performed the analysis for the purposes of cross-examination.

(3) Nothing in this subsection shall be construed to abrogate the defendant's right to cross-examination.

In *Lockhart v. State,* 314 Ark. 394, 862 S.W.2d 265 (1993), we explained that pursuant to this statute, the state official who actually performed the test, or autopsy as in this case, must appear at the trial for cross-examination if the defendant gives notice at least ten days prior to trial. In contrast, we held that the defendant who fails to give timely notice waives his statutory right to confront the person who performed the analysis. *Id.* Finally, we held in *Lockhart* that the State has the burden to produce the examiner or obtain a continuance only when the State has caused the defendant to be unable to comply with the statute's ten-day notice prerequisite. *Id.*; *see also Dodson v. State,* 326 Ark. 637, 934 S.W.2d 198 (1996).

In this case, the trial court asked Mr. Marta if he had subpoenaed Dr. Kokes, and Mr. Marta responded, "No, I did not, Your Honor." On appeal, Mr. Marta declares, for the first

time, that he actually subpoenaed Dr. Kokes on three occasions[1], and thus he properly asserted his confrontation rights under Ark. Code Ann. § 12-12-313. We, however, cannot reach the merits of this issue for two reasons. First, Mr. Marta never referred to or otherwise brought the statute to trial court's attention. Instead, he merely argued that he had a general right to confront Dr. Kokes. Second, Mr. Marta failed to disclose to the trial court that he actually subpoenaed Dr. Kokes on three occasions. The purpose of the contemporaneous-objection rule is to give the trial court an opportunity to know the reason for the disagreement with its proposed action prior to making its decision. *State v. Donahue*, 334 Ark. 429, 978 S.W.2d 748 (1998); *State v. Brummett*, 318 Ark. 220, 885 S.W.2d 8 (1994). Likewise, we have precluded appellants from raising arguments on appeal, that were not first brought to the attention of the trial court. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997); *McGhee v. State*, 330 Ark. 38, 954 S.W.2d 206 (1997). Here, Mr. Marta failed to apprise the trial court of the correct facts and the necessary statute in order for it to rule on his objection. It would be inherently unfair to reverse the trial judge on a matter of which he was never properly apprised. Accordingly, we hold that the issue is procedurally barred.

 ██ Mr. Marta's argument also fails on the merits because we have said that an appellant must also demonstrate that he has been prejudiced, beyond the bare assertion of the constitutional right to confront the witness, by the denial of cross-examination or that such request would have availed him anything. *Lockhart, supra; Dodson, supra.* On appeal, Mr. Marta argues that he was prejudiced by his inability to cross-examine Dr. Kokes about his estimation of the time of death. Specifically, Mr. Marta wanted to question Dr. Kokes about: 1) the time Mr. Walker's body arrived at the morgue, 2) whether the police reports accompanied Mr. Walker's body, and 3) the amount of ethyl alcohol that was in the Mr. Walker's bloodstream. Mr. Marta claims that by questioning Dr. Kokes about these matters, he could have estab-

---

[1] Mr. Marta subpoenaed Dr. Kokes on three occasions: 1) March 26, 1997, for testimony on April 1, 1997; 2) April 16, 1997, for testimony on June 2, 1997; and 3) May 12, 1997, for testimony on July 9, 10, and 11, 1997. Mr. Marta's trial was held on July 9, 10, and 11, 1997.

lished the Mr. Walker died several hours later when Mr. Blackford sneaked out of the trailer and returned to Mr. Walker's duplex. Because this information could only be determined by reading reports prepared by other individuals, Dr. Kokes would not have possessed any more knowledge about the matters than Dr. Sturner. Thus, we hold that Mr. Marta has failed to demonstrate how he was prejudiced by Dr. Kokes's failure to appear at his trial.

Affirmed.